UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                          :

SHAVEZ JACKSON, individually and on behalf  :
of others similarly situated,

                            Plaintiffs,   :                13 Civ. 2001 (JPO)
                                            :

                    -v-                 :             OPINION AND ORDER
                                            :

BLOOMBERG, L.P.,                       :
                            Defendant.   :
                                          :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Shavez Jackson, individually and on behalf of all others similarly situated,

brings this putative collective and class action against Bloomberg L.P. ("Bloomberg") for

allegedly failing to compensate Global Customer Support Representatives ("GCSRs") for

overtime in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and

New York Labor Law § 650 *et seq.* ("NYLL").  Before the Court is Plaintiff's motion to

conditionally certify a FLSA collective action; to certify a class pursuant to Federal Rule of Civil

Procedure 23 with respect to the NYLL claims; to authorize issuance of a proposed notice to

potential class members; and to order Bloomberg to provide information to identify potential

class members.  For the reasons that follow, the motion is granted.

## I.    Background

### A.    Factual Background

      Unless otherwise indicated, the following facts are taken from the allegations in the

Amended Complaint (Dkt. No. 3 ("Am. Compl.")) and Plaintiff's submissions made in

connection therewith.

Plaintiff is a New York resident who was employed by Bloomberg as a GCSR from February 2008 through September 2010. Bloomberg, a Delaware corporation with its principal place of business in New York, is a multinational mass media corporation that provides financial tools to companies and organizations around the world. Bloomberg's core business is a news, data, and analytics platform delivered to subscribers through its proprietary Bloomberg Professional service, a sophisticated computer system that provides news, data, analytics, and functionalities regarding fixed income and equity securities, derivatives, commodities, and foreign exchange. (Dkt. No. 22 ("Shannon Decl.") ¶ 2.)

A vital component of Bloomberg's customer service is its contingent of GCSRs, who are responsible for fielding every call to Bloomberg's customer service phone number. (*Id.* ¶ 3.) Due to the breadth and complexity of the issues they handle, GCSRs generally undergo intensive training during which they receive classroom instruction on each of Bloomberg's business divisions and products, as well as hands-on training with the technology they will use. (*Id.* ¶ 8.) GCSRs are expected to exercise independent judgment and discretion in determining whether they can assist a customer, and, if not, who in the company is best positioned to do so. (Dkt. No. 21 ("Elmy Decl.") ¶ 3; Shannon Decl. ¶ 7.)

While GCSRs are primarily employed to answer phone calls, they are also encouraged to work on special projects to help Bloomberg enhance its products and service levels. (Elmy Decl. ¶ 2; Shannon Decl. ¶ 6.) These include, for instance, specializing in a particular area of Bloomberg's business to answer higher-level questions and train other representatives; monitoring conference call technology and becoming proficient in the specialized conference-call software; participating in a think tank to conceptualize ways to make the customer service process more efficient; tracking daily and weekly call statistics; recruiting and assisting in the hiring of new GCSRs; and learning or training others on a foreign language. (Shannon Decl.

¶ 10.)  Most GCSRs spend, on average, five hours a day handling calls and about two to three hours a day on special projects.  (Elmy Decl. ¶ 2; Shannon Decl. ¶ 6.)

GCSRs are paid at a salary rate for 40 hours of work per week.  Plaintiff alleges, however, that GCSRs regularly worked in excess of 40 hours per week without receiving overtime pay.  Specifically, Bloomberg had a policy requiring them to be at work before their shift to log in and after their shift to complete jobs, update work tickets, and log off; to work during lunch hours to complete jobs; to work on weekends and holidays, for which they were allowed to take "comp time" in a later pay week; and to work from home to update and complete work tickets, study training materials, and take exams.

Until recently, Bloomberg classified GCSRs as exempt from FLSA's overtime pay provisions.  (Shannon Decl. ¶ 20.)  In March 2013, Bloomberg and the United States Department of Labor ("DOL") entered into an agreement requiring Bloomberg to reclassify certain positions, including GCSRs, as non-exempt.  (Dkt. No. 20 ("Golden Decl.") ¶ 7; Ex. A ("DOL Settlement").)  Pursuant to the settlement, on April 25, 2013, Bloomberg sent checks to eligible GCSRs along with a cover letter explaining that cashing the check would constitute waiver of one's claims for back pay and related damages under FLSA.  (Golden Decl. ¶ 8; DOL Settlement.)  On April 28, 2013, Bloomberg reclassified GCSRs as non-exempt.  (Shannon Decl. ¶ 20.)[1]

---

[1] The parties dispute whether Bloomberg's counsel intentionally failed to disclose to DOL the existence of the instant action prior to DOL's approval of the settlement; what percentage of potential class members have cashed their settlement checks; and whether cashing the check constitutes waiver of one's FLSA claims.  Even assuming these issues in Bloomberg's favor, there remain outstanding FLSA claims to support a collective action.  The DOL Settlement covers employees for the period from July 1, 2009 through July 1, 2011 (DOL Settlement), but Bloomberg did not reclassify GCSRs until nearly two years later on April 28, 2013.  Moreover, not all employees covered by the settlement have cashed their checks.  (Golden Decl. ¶ 4 (stating that 67 of 95 employees covered by the settlement have cashed their checks).)  The settlement

### B.       Procedural Background

Plaintiff filed a class and collective action complaint on March 27, 2013.  (Dkt. No. 1.)

On April 11, she amended the complaint to include a demand for injunctive relief.  (Am. Compl.

¶ 48.)  Bloomberg answered on May 7.  (Dkt. No. 7.)  On June 19, Plaintiff filed the instant

motion seeking certification of a class action pursuant to Rule 23 and conditional certification of

a FLSA collective action.  (Dkt. Nos. 13 & 14 ("Pl.'s Mem.").)  Bloomberg opposed on July 11,

and Plaintiff replied on July 25.  (Dkt. Nos. 19 & 24.)

## II.   Legal Standards

### A.       FLSA Conditional Certification

FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the

minimum standard of living necessary for health, efficiency, and general well-being of workers."

29 U.S.C. § 202(a).  To that end, the statute requires employers to pay employees for hours

worked in excess of 40 per week "at a rate not less than one and one-half times the regular rate at

which [they are] employed."  *Id.* § 207(a)(1).  Section 216(b) confers a private right of action

upon employees to recover unpaid overtime compensation and "an additional equal amount as

liquidated damages" for any overtime which the employer required or knowingly permitted.

*Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 289-90 (2d Cir. 2008).  That section also permits

employees who are "similarly situated" to bring a collective action, thus enabling them to pool

their resources and promoting judicial efficiency.  *Lynch v. United Servs. Auto. Ass'n*, 491 F.

Supp. 2d 357, 367 (S.D.N.Y. 2007) (citation omitted).  Unlike Rule 23 class actions, FLSA

collective actions are opt-in, meaning that a person is not a party to the action "unless he gives

his consent in writing to become such a party and such consent is filed in the court in which such

---

does not affect NYLL claims and is therefore not relevant to the Court's Rule 23 class
certification analysis.  (DOL Settlement.)

action is brought."  29 U.S.C. § 216(b).  The Second Circuit has endorsed a two-step approach to FLSA collective actions.

First, the court must examine whether the plaintiffs have made a "modest factual showing" that they and potential class members are similarly situated insofar as they "were victims of a common policy or plan that violated the law."  *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (citations and quotations omitted).  "[P]laintiffs accomplish this by making some showing that there are other employees . . . who are similarly situated with respect to their job requirements and with regard to their pay provisions . . . [and] are classified as exempt pursuant to a common policy or scheme."  *Id.* (citation and quotations omitted).  "Plaintiffs may satisfy this requirement by relying on their own pleadings, affidavits, [and] declarations, or the affidavits and declarations of other potential class members."  *Hallissey v. Am. Online, Inc.*, No. 99 Civ. 3785 (KTD), 2008 WL 465112, at *1 (S.D.N.Y. Feb. 19, 2008) (citation omitted).  At this initial stage, "the court does not resolve factual disputes, decide substantial issues going to the ultimate merits, or make credibility determinations."  *Lynch*, 491 F. Supp. 2d at 368 (citation omitted).  If the employees are similarly situated in these material respects, "any factual variances that may exist between the plaintiff and the putative class [will] not defeat conditional class certification."  *Id.* at 369.

The modest factual showing standard is very low and "considerably less stringent than the requirements for class certification under Rule 23."  *Poplawski v. Metroplex on the Atl., LLC*, 2012 WL 1107711, at *3 (E.D.N.Y. Apr. 2, 2012) (citation and quotations omitted).  Because the determination that plaintiffs are similarly situated is merely a preliminary one, courts generally grant conditional certification.  *Amador v. Morgan Stanley & Co. LLC*, No. 11 Civ. 4326 (RJS), 2013 WL 494020, at *3 (S.D.N.Y. Feb. 7, 2013); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006) (citation omitted).  "If the plaintiffs demonstrate that 'similarly situated'

5

employees exist, the [c]ourt should conditionally certify the class, order that appropriate notice be given to putative class members, and the action should continue as a collective action throughout the discovery process." *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 402 (S.D.N.Y. 2012) (citation and quotations omitted).  At the second stage, after plaintiffs have opted in and there has been discovery, "courts conduct a more stringent 'second tier' analysis upon a full record to decide whether the additional plaintiffs are similarly situated to the original plaintiffs." *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361 (PGG), 2010 WL 2465488, at *4 (S.D.N.Y. June 16, 2010).  If the court determines that the plaintiffs are not similarly situated, the collective action will be de-certified and the opt-in plaintiffs' claims will be dismissed without prejudice.  *Myers*, 624 F.3d at 555 (citation omitted).

**B.      Rule 23 Class Certification**

Class certification is governed by Federal Rule of Civil Procedure 23.  Section (a) requires the party seeking certification to initially establish four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to establishing numerosity, commonality, typicality, and adequacy, the movant must show that the action is one of three types described in section (b).  *Id.* 23(b).  Plaintiff seeks certification under subsection (b)(3), which requires that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.* 23(b)(3).  In evaluating predominance and superiority, courts consider:

(A) the class members' interests in individually controlling the
prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the
controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation
of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

*Id.* 23(b)(3)(A)-(D).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541, 2551 (2011). Rather, the party seeking class certification must actually
establish its requirements by a preponderance of the evidence. *In re Initial Public Offerings Sec.
Litig. ("IPO")*, 471 F.3d 24, 34, 37-38 (2d Cir. 2006) (citation omitted). While the plaintiff's
pleadings are assumed to be true, the court must nevertheless conduct a rigorous analysis to
determine whether a class action is appropriate, considering materials outside of the pleadings
and weighing conflicting evidence as necessary. *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No.
11 Civ. 6546 (JPO), 2013 WL 93636, at *3-4 (S.D.N.Y. Jan. 9, 2013) (citations omitted);
*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 155 (S.D.N.Y. 2008). This analysis will
frequently overlap with the merits of the underlying claims. *Dukes*, 131 S. Ct. at 2551.
However, any factual determinations made at the certification stage are not binding upon a
subsequent fact-finder, including the certifying court. *IPO*, 471 F.3d at 41.

"The Second Circuit has emphasized that Rule 23 should be given liberal rather than
restrictive construction, and it seems beyond peradventure that the Second Circuit's general
preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*,
280 F.R.D. 113, 124 (S.D.N.Y. 2011) (citation omitted). "The rule's inherent flexibility, and the
district court's ability to manage the litigation as it develops, counsel against decertification."
*Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Where a FLSA
collective action based upon the same set of facts has been certified, courts are inclined to grant

class certification of related state law claims. *Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 392 (S.D.N.Y. 2011) (citation omitted).

### C.    Administrative Exemption

DOL regulations enacted pursuant to FLSA exempt certain categories of employees from the statute's overtime provisions. These exemptions are affirmative defenses to FLSA claims, and the employer bears the burden of proving that they apply. *Indergit*, 2010 WL 2465488, at *2. "[B]ecause the FLSA is a remedial act, its exemptions . . . are to be narrowly construed" and there is "a presumption" that they do not apply. *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991) (citations omitted). FLSA's exemptions are incorporated into the NYLL. *Romero v. H.B. Auto. Group, Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *7 (S.D.N.Y. May 1, 2012) (citations omitted).

Relevant here is the administrative exemption, which exempts salaried workers earning at least $455 per week "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)-(3). Work is "directly related to the management or general business operations" of the employer's business if it is "directly related to assisting with the running or servicing of the business." *Id.* § 541.201(a). The "exercise of discretion and independent judgment" generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). Whether something is a "matter of significance" turns upon "the level of importance or consequence of the work performed." *Id.* An employee's "primary duty" depends upon factors such as "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's

relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* § 541.700(a).  Thus, whether the exemption is applicable "is a mixed question of law and fact" that depends upon "the employees' actual job characteristics and duties" and requires consideration of "all the facts in a particular case."  *Myers*, 624 F.3d at 548 (citations and quotations omitted).

## III.    Discussion

### A.    FLSA Collective Action

Plaintiff seeks conditional certification of a collective action for a class defined as "Global Customer Support (GCUS) Representatives in the U.S. who worked more than 40 hours in a pay week without payment of overtime at the rate of time and one-half within the three years preceding the filing of a consent to sue by such individual."  (Pl.'s Mem. at 33.)[2]  Plaintiff has satisfied her minimal burden of demonstrating that GCSRs are similarly situated.  In addition to the allegations in the Amended Complaint, declarations from Plaintiff and two additional GCSRs attest that GCSRs had the same title, same primary responsibility of answering phone calls, same pay provisions, same location of employment, and same designation as exempt from overtime requirements under the administrative exemption.  (Dkt. No. 15 ("Jackson Decl."); Dkt. No. 16 ("Mrozewski Decl."); Dkt. No. 17 ("Tembe Decl.").)  These allegations, which Bloomberg does not contest, are supported by the DOL Settlement.  (Elmy Decl. ¶ 2; Shannon Decl. ¶ 6; DOL Settlement.)

Bloomberg nevertheless opposes conditional certification on the basis that GCSRs have various secondary job duties, *i.e.*, special projects, and were subject to varying levels of

---

[2] FLSA's statute of limitations is two years, or three years if the employer willfully violated the statute.  29 U.S.C. § 255(a).  Jackson alleges that Bloomberg acted willfully.  (Am. Compl. ¶ 46.)

supervision, such that at least some may be covered under FLSA's administrative exemption.  As an initial matter, the fact that Bloomberg has treated GCSRs collectively—initially classifying them as exempt and now as non-exempt—"militates strongly in favor of granting certification" and "cuts against" its argument that individualized inquiries will be necessary.  *Trawinski v. KPMG LLP*, No. 11 Civ. 2978 (PAC), 2012 WL 6758059, at *4 (S.D.N.Y. Dec. 21, 2012); *see also Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160 (JPO), 2012 WL 260230, at *8 (S.D.N.Y. Jan. 27, 2012) (rejecting defendants' argument that the need for individualized inquiries precluded conditional certification because "[d]efendants did not consider the differences in ASMs' job duties sufficient to require Duane Reade to undertake an individual analysis before categorically classifying all ASMs as exempt from FLSA").  In any event, Bloomberg's argument misconstrues the scope of the inquiry at this stage.  Plaintiff need only demonstrate that her position is similar to that of putative class members, not identical, and Bloomberg cannot defeat this showing by arguing that individual issues may predominate over common ones.  *See, e.g.*, *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 565 (S.D.N.Y. 2012) (citation omitted); *Cunningham v. Electronic Data Sys. Corp.*, 754 F. Supp. 2d 638, 647-48 (S.D.N.Y. 2010) (citations omitted); *Cohen v. Gerson Lehrman Group, Inc.*, 686 F. Supp. 2d 317, 329-31 (S.D.N.Y. 2010); *Francis v. A&E Stores, Inc.*, No. 06 Civ. 1638 (CS), 2008 WL 4619858, at *3 (S.D.N.Y. Oct. 16, 2008) (citation omitted).  If the mere existence of possible exemptions could defeat conditional certification, "no FLSA action that is premised upon an alleged misclassification under [an] . . . exemption could be resolved through the collective action process, thereby defeating the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit."  *Indergit*, 2010 WL 2465488, at *9 (citation omitted).

Bloomberg cites *Romero v. H.B. Auto. Group, Inc.*, which recognizes that "the possible existence of exemptions may be relevant to an analysis of whether employees are similarly situated to each other." 2012 WL 1514810, at *7 (emphasis removed). But *Romero* addressed certification of a collective action at the second stage, after discovery had taken place. Moreover, the nebulously defined class of "non-managerial employees" in that case encompassed at least six different job categories with vastly different duties, where two exemptions were potentially applicable and the employees consequently "may have been subjected to *different* 'plans' or 'policies' to deprive [them] of legally due wages." *Id.* at *13-19. The proposed class also consisted of employees who were classified as exempt and others classified as non-exempt. *Id.* at *14. Judge McMahon accordingly declined conditional certification because the "putative opt-ins [were] not [in fact] similarly situated with respect to their job duties *or* exempt-status." *Id.* (emphasis added). *Romero* is distinguishable from this case, where discovery has not occurred and the proposed class members have the same title, same primary responsibilities, and same exemption classification. Nor does *Romero* stand for the proposition that collective action is precluded—even at the conditional certification stage—if the defendant raises an exemption defense. Indeed, Judge McMahon observed in an earlier, more typical FLSA action that "[t]he extent of the individual differences, and their legal significance (both with regard to similarity and to the ultimate question of exemption) may be a contested and difficult question," and is one to be resolved at the second stage, after development of the record. *Pippins v. KPMG LLP*, No. 11 Civ. 0377 (CM), 2012 WL 19379, at *4, 11 (S.D.N.Y. Jan. 3, 2012) (conditionally certifying collective action despite possible existence of exemptions). Other judges in this District have similarly recognized that the possible existence of exemptions is a merits issue that is not relevant at the conditional certification stage. *See, e.g.*, *Trawinski*, 2012 WL 6758059, at *4.

11

Bloomberg also relies upon *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010), and *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003). *Guillen*, however, was a putative collective action on behalf of department store assistant managers nationwide, where the plaintiff argued that the class members' official job description was inaccurate. 750 F. Supp. 2d at 476-80. That case is inapposite here because Plaintiff seeks to bring an action on behalf of GCSRs in a single office and does not challenge the accuracy of their official job description. *See, e.g.*, *Pippins*, 2012 WL 19379, at *12 (noting that *Guillen* "merely stands for the proposition that a court cannot certify a nationwide class without some showing that plaintiffs across the nation are similarly situated"). In *Mike*, the Court refused to conditionally certify a collective action, reasoning that the possibility of administrative exemptions meant individual questions would predominate over questions common to the class. 274 F. Supp. 2d at 220. As previously explained, courts in this District refuse to undertake such an inquiry at this preliminary stage. This Court therefore declines to follow *Mike*. In any event, Plaintiff's evidence regarding GCSRs' responsibilities pertains solely to their primary role of answering phone calls and does not provide a basis for inferring that GCSRs had secondary roles which may render them exempt under the administrative exemption. Nor can the Court rely upon Bloomberg's affidavits to resolve the factual question whether GCSRs are similarly situated. *Jacob*, 2012 WL 260230, at *7-8. The Court therefore grants Plaintiff's request for conditional certification under FLSA.

### B.     NYLL Class Action

Like FLSA, the NYLL requires employers to pay employees at the rate of time and one-half for hours worked in excess of 40 per week. 12 N.Y.C.R.R. § 146-1.4. The NYLL does not, however, contain a provision for collective action. *See, e.g.*, *Damassia*, 250 F.R.D. at 154. In order to litigate the NYLL claims on a collective basis, Plaintiff therefore seeks certification

pursuant to Rule 23 of a class defined as "Global Customer Support (GCUS) Representatives working in New York who worked more than 40 hours in a pay week without payment of overtime at the rate of time and one-half at any time within the six years preceding March 26, 2013." (Pl.'s Mem. at 33.) Plaintiff also seeks appointment of Getman Sweeney PLLC as class counsel.

### 1.   Rule 23(a)

#### a.   Numerosity

Courts presume numerosity such that joinder is impracticable where the class exceeds 40 members. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citation omitted). It is undisputed that Bloomberg generally employs around 50 GCSRs in its New York call center at any given time. (Jackson Decl. ¶ 7 (estimating 50 to 60 at a time); Mrozewski Decl. ¶ 8 (same); Tembe Decl. ¶ 7 (same); Shannon Decl. ¶ 4 (45 to 50).) Moreover, because the proposed class spans six years, its membership likely substantially exceeds this amount. (*Cf.* Goldman Decl. ¶ 10 (noting that there were 95 current and former GCSRs for the two-year DOL Settlement period).) Numerosity is therefore satisfied.

#### b.   Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S. Ct. at 2551 (citation and quotations omitted). It asks not simply whether there are questions of law or fact common to the class, but whether a class action is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)). In other words, there must be "a common contention . . . of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Even a single common legal or factual

13

question will suffice." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citation omitted).

Plaintiff identifies several factual questions, common among all putative class members, including whether Bloomberg suffered or permitted GCSRs to work over 40 hours per week; knew that they did; failed to pay them overtime; failed to record all hours that they worked; and gave them comp time instead of overtime pay for work on holidays and weekends. Plaintiff also identifies two common legal questions: whether Bloomberg's failure to pay overtime was lawful, and whether it was done in good faith. Questions such as these are generally ideal for class resolution. *See, e.g.*, *Poplawski*, 2012 WL 1107711, at *7 ("In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices.") (citation omitted). Bloomberg, however, contests commonality on two grounds.

First, it reiterates the argument—made in opposition to conditional certification—that the possible existence of administrative exemptions renders GCSRs too dissimilar for class treatment. Yet Bloomberg does not dispute the allegations from Plaintiff and two additional GCSRs that the "primary job" of GCSRs was to answer phone calls and determine where to route them within the company, and that they personally resolved only minor issues such as re-setting passwords and checking account balances. (Jackson Decl. ¶¶ 7, 8, 10; Mrozewski Decl. ¶¶ 7, 9, 11; Tembe Decl. ¶¶ 6, 8, 10.) On the contrary, Bloomberg similarly attests that GCSRs are "primarily responsible" for receiving and routing phone calls; spend an average of five hours a day doing so; and personally handle rote tasks such as "resetting passwords or providing login information to a customer." (Elmy Decl. ¶¶ 2-3; Shannon Decl. ¶ 6.) Thus, the parties agree that GCSRs are similar in most material respects. Bloomberg's contention that individualized proof will be necessary to determine whether GCSRs are exempt does not defeat commonality, and is

14

"better suited to the predominance inquiry." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y. 2013), *reconsidered on other grounds*, 293 F.R.D. 578 (S.D.N.Y. 2013); *see also Damassia*, 250 F.R.D. at 156-57 (same).

Second, Bloomberg contends that it did not have a common policy requiring GCSRs to work overtime or "off the clock."[3]  Again, Bloomberg's objection is belied by its own admissions.  Bloomberg concedes that GCSRs were required to be logged in and ready to work when their shift began.  (Shannon Decl. ¶ 15.)  It also concedes that they were expected to work after the end of their shift to complete calls, and to enter notes to tickets for each call and log out at the end of their shift.  (Elmy Decl. ¶ 16.)  Bloomberg describes these activities as minimal, asserting that the act of logging in or logging out takes less than a minute and that there is "very little 'after call' work."  (Elmy Decl. ¶ 16; Shannon Decl. ¶ 15.)  That such work may be minimal does not change the fact that it was required.  Moreover, the import of these admissions is compounded by Bloomberg's badge data for Plaintiff, which shows that she was physically in the office for more than 40 hours during 58 out of 132 weeks of employment, or 44% of the time.  (Golden Decl., Ex. C ("Badge Data").)  The Court also finds relevant DOL's conclusion—and Bloomberg's concession for purposes of the DOL Settlement—that GCSRs worked more than 40 hours per week and were therefore entitled to overtime compensation.  Although Bloomberg disputes that GCSRs were required to work from home, the Court finds that the allegations from Plaintiff and two additional GCSRs, considered in light of the rest of the evidence, are sufficient to establish an "off the clock" policy.  In sum, Plaintiff has demonstrated,

---

[3] Bloomberg also asserts that if GCSRs did work overtime, individualized inquiries will be necessary to determine what they were doing and whether it was compensable.  This argument is better left to the predominance inquiry, and in any event, the Court has identified other common questions that are central to Plaintiffs' claims.

by a preponderance of the evidence, that Bloomberg had a common policy or plan requiring or knowingly permitting GCSRs to work overtime in the ways alleged.

Bloomberg's blanket reliance upon *Dukes* is unpersuasive. That case involved gender discrimination claims by a putative class of more than 2 million Wal-Mart employees nationwide. Appropriately, "[t]he weight of authority rejects the argument that *Dukes* bars certification in wage and hour cases." *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) (collecting cases). In *Dukes*, "the Supreme Court was concerned that, '[w]ithout some glue holding the alleged reasons behind all of Wal-Mart's [individual employment] decisions together, it w[ould] be impossible to say that examination of all the class members' claims for relief w[ould] produce a common answer to the crucial question why was I disfavored." *Pippins*, 2012 WL 19379, at *7 (quoting *Dukes*, 131 S. Ct. at 2552). "Unlike the claims in [*Dukes*], [Plaintiffs'] NYLL claims do not require an examination of the subjective intent behind millions of individual employment decisions; rather, the crux of this case is whether the company-wide policies, as implemented, violated [Plaintiffs'] statutory rights." *Youngblood v. Family Dollar Stores, Inc.*, No. 09 Civ. 3176 (RMB), 2011 WL 4597555, at *4 (S.D.N.Y. Oct. 4, 2011) (citations and quotations omitted). Put differently, Bloomberg's overtime policy "is the 'glue' that the Supreme Court found lacking in *Dukes*." *Pippins*, 2012 WL 19379, at *7.

### c.    Typicality

The requirements of commonality and typicality "tend to merge into one another, so that similar considerations animate analysis of [both]." *Marisol A.*, 126 F.3d at 376 (citations omitted). "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1992) (citations

omitted).  "[T]here is no requirement that the precise factual circumstances of each class plaintiff's claim be shared by the named plaintiff." *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *4 (E.D.N.Y. Apr. 9, 2010).  Rather, if the plaintiff alleges that "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citations omitted).  In considering typicality, "the court must pay special attention to unique defenses that are not shared by the class representatives and members of the class," *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003), and typicality is generally precluded if such defenses would "threaten to become the focus of the litigation," *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 97 (S.D.N.Y. 2010) (citations and quotations omitted).

Plaintiff's claims are typical of those of the class because all class members have the same title and primary responsibility, were employed in the same New York call center, were paid on the same salaried basis, and were subject to the same overtime policy.  Bloomberg challenges Plaintiff's typicality on the grounds that she was only in the office on average 36.6 hours per week and was consistently late.  (Elmy Decl. ¶¶ 13, 18; Shannon Decl. ¶¶ 22-24; Badge Data.)  Yet the very badge data Bloomberg relies upon reveals that Plaintiff worked overtime 44% of the time, and is therefore clearly a member of the class.  That she did not work overtime as often and consequently may be entitled to less damages than other members of the class does not make her atypical.  *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 87 (S.D.N.Y. 2001) (citation omitted).  Bloomberg's allegation that Plaintiff was frequently late also does not render her atypical, as it is not inconsistent with her allegation that she was nevertheless required to be at work before her shift.  Nor is it necessary for the named representative to have suffered in ways identical to the remainder of the class.

17

###### d.      Adequacy

"Adequacy of representation is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 128-29 (S.D.N.Y. 2012) (citation omitted).  With respect to the latter, courts consider whether the named plaintiff has sufficient knowledge of the facts of his or her claim, and whether there is a conflict between the interests of the named plaintiff and the rest of the class.  *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 372 (S.D.N.Y. 2007).  "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1768 (3d ed.).

Bloomberg does not contest the adequacy of Plaintiff's counsel, and the Court is satisfied, based upon counsel's experience in handling class actions and employee wage and hour cases, that he and his firm are qualified to represent and capable of representing the class. Bloomberg does, however, challenge Plaintiff's ability to adequately represent the class based upon her poor performance and allegedly questionable credibility.  With respect to the former, Bloomberg claims that Plaintiff was frequently subject to reprimand and was eventually fired, and such issues will distract from the claims of the class.  But these issues are not relevant to the question whether Plaintiff worked overtime and is therefore entitled to overtime pay.  *See, e.g.*, *Iglesias-Mendoza*, 239 F.R.D. at 372.  They consequently cannot give rise to a conflict between Plaintiff and the rest of the class.  The sole case Bloomberg cites in support, *Meyers v. ACE Hardware, Inc.*, is distinguishable because it was a Title VII race discrimination class action where the named representative's alleged poor performance may have been the actual reason that he was fired.  95 F.R.D. 145, 152 (N.D. Ohio 1982).

With respect to Plaintiff's credibility, Bloomberg contrasts Plaintiff's claim that she typically worked ten to fifteen hours of overtime per week with her badge data, which indicates that she was in the office more than 50 hours in a week during only 10 out of 132 weeks of employment.  (Jackson Decl. ¶ 19; Elmy Decl. ¶ 18; Badge Data.)  Plaintiff's credibility is relevant in determining whether she can adequately represent the class.  *See, e.g.*, *Darwin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985).  However, there is nothing about her allegation that is incredible.  Badge data accounts only for the time an employee was physically present and badged into the building.  (Golden Decl. ¶ 11.)  Plaintiff's overtime allegations, however, account for numerous activities outside of the office, such as checking e-mail from home and studying for and taking exams.  Regardless, the possible discrepancy between the actual hours Plaintiff worked and her recollection is not a sufficient basis to find her non-credible, since two other GCSRs have corroborated—and Bloomberg has effectively conceded—Plaintiff's general overtime allegations.  The Court is also satisfied, based upon Plaintiff's declaration, that she has sufficient knowledge of the facts of the case.  She is therefore an adequate representative of the class.

## 2.   Rule 23(b)(3)

### a.   Predominance

The predominance inquiry is similar to the commonality inquiry, but "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "The requirement's purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Myers*, 624 F.3d at 547 (citation, quotations, and brackets omitted).  Accordingly, the requirement is satisfied only "if

19

resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (citation omitted).  The Court has already identified a number of common questions central to Plaintiffs' claims that can be resolved through class adjudication.  Bloomberg offers two arguments for why individual issues will predominate over common ones—the first based upon the possible existence of administrative exemptions, and the second based upon the purported need for individualized inquiries to determine damages.

### i.      Administrative Exemption

Bloomberg asserts that "it is confident that," once discovery is completed, "at least some" GCSRs will be exempt under the administrative exemption, and the fact-intensive, individualized analysis necessary to make such determinations will overwhelm common issues.  (Dkt. No. 19 at 11.)  The Second Circuit has emphasized that the fact that the exemption analysis requires consideration of an employee's actual duties does not mean that it "is an *inherently* individualized inquiry, such that class treatment will never be appropriate in exemption cases," and "district courts in this Circuit have certified classes on state law claims that turn on the question of FLSA exemption for a particular group of employees." *Myers*, 624 F.3d at 549 (citing *Damassia*, 250 F.R.D. 152).  Predominance will be satisfied "if the plaintiffs can show that 'some' of the . . . questions [relevant to the exemption analysis] can be answered with respect to the members of the class as a whole 'through generalized proof' and that those common issues are 'more substantial' than individual ones." *Id.* (citation omitted).

In *Damassia*, then-District Judge Lynch granted certification of a NYLL overtime class of assistant managers ("ASMs") at Duane Reade stores, despite the possible existence of executive and administrative exemptions.  In analyzing predominance, Judge Lynch relied upon

the facts that the defendant had a single general job description for ASMs and considered all ASMs exempt, "regardless of . . . the factors that [it] now argue[d] might contribute to material differences in the[ir] responsibilities"; that the responsibilities of ASMs were largely consistent; and that there was no evidence that the differences were "of such a magnitude as to cause individual issues to predominate." *Damassia*, 250 F.R.D. at 158-61.  Similarly, in *Jacob*, this Court certified a NYLL overtime class of ASMs at Duane Reade stores, reasoning that the ASMs had "similar primary job responsibilities," and while their "experience certainly varie[d] at the margins . . . most, if not all, . . . perform[ed] a similar swath of duties."  289 F.R.D. at 419-21.  In *Myers*, in contrast, the Second Circuit affirmed the district court's denial of class certification where the plaintiff sought to certify a nationwide class of Hertz station managers, relying principally upon testimony indicating that each location was unique and that the primary duties of managers differed across locations.  624 F.3d at 550.

This case is more like *Damassia* and *Jacob* than *Myers*.  The parties agree that GCSRs have the same primary responsibility—taking and routing calls—and Bloomberg represents that they spend, on average, five hours a day taking calls.  While Bloomberg stresses that GCSRs are involved in a variety of special projects and are subject to different levels of supervision, the GCSR experience appears to vary only "at the margins."  *Jacob*, 289 F.R.D. at 420-21.[4]  The administrative exemption focuses on an employee's primary duty, and DOL has instructed that the time spent performing exempt work, while not conclusive, "can be a useful guide in determining whether exempt work is the primary duty of the employee," and "employees who

---

[4] Bloomberg notes that GCSRs spend varying amounts of time working on special projects on any given day because they have significant discretion in determining what to work on. (Shannon Decl. ¶¶ 9, 11.)  As noted, however, Bloomberg admits that GCSRs spend, on average, five hours of their day handling phone calls.  An employee is not exempt one day and non-exempt the next.  Rather, the administrative exemption focuses on the employee's primary duty, as defined, *inter alia*, by the general breakdown of their time between exempt and non-exempt activities.

spend more than 50 percent of their time performing exempt work will *generally* satisfy the primary duty requirement."  29 C.F.R. § 541.700(a)-(b) (emphasis added).  Consequently, it probably will not matter whether, for instance, one GCSR spent three hours a day specializing in a particular area of Bloomberg's business, while another spent three hours a day participating in a think tank to make the customer service process more efficient.  The crux of the inquiry will be whether the GCSRs' main activity—answering and routing calls—is exempt.  This conclusion is bolstered by Bloomberg's own treatment of GCSRs, which, while not dispositive of the predominance issue, suggests that Bloomberg "believes some degree of homogeneity exists among the employees, and is thus in a general way relevant to the inquiry."  *Myers*, 624 F.3d at 549 (citation omitted).  That DOL also chose to treat GCSRs as a class after its own extensive investigation further mitigates concerns that individualized inquiries may overwhelm common ones.  *Indergit*, 293 F.R.D. at 658.  On the whole, the "evidence tend[s] to show that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria," such that the Court may be able to determine, in one sweep, whether GCSRs are exempt.  *Myers*, 624 F.3d at 549 (citing *Damassia*, 250 F.R.D. at 156-61).

Additionally, while the Court cannot and does not resolve at this stage whether any or all GCSRs are exempt, it is appropriate to consider the merits of Bloomberg's exemption defense to determine its plausibility, and the Court is dubious whether a non-*de minimis* number of GCSRs are exempt.  Bloomberg itself hedges, stating that "at least some" will be exempt.  DOL has determined that none are, and Bloomberg has accepted that determination for purposes of the DOL Settlement.  The cases cited by Bloomberg are largely distinguishable.  In *Haywood v. N. Am. Van Lines, Inc.*, the plaintiff's primary duty was to resolve customer complaints, conduct investigations, adjust claims, and negotiate with customers to try to settle claims and prevent litigation.  121 F.3d 1066, 1068 (7th Cir. 1997), *overruled on other grounds*, *Hill v. Tangherlini*,

724 F.3d 965 (7th Cir. 2013).  In concluding that the plaintiff was exempt under the administrative exemption, the Seventh Circuit noted, among other things, that "[s]he performed functions somewhat analogous to those performed by claims agents and adjusters, who are specifically mentioned by the [DOL] regulations"; was often the sole contact between her employer and its customers; and was responsible for keeping customers happy with the company.  *Id.* at 1072.  Similarly, in *Verkuilen v. Mediabank LLC*, the plaintiff was primarily responsible for assisting customers in using the company's software, and her duties included explaining software problems to the company's developers in order for coding changes to be implemented, as well as providing on-site support and training sessions for clients.  2010 WL 2011713, at *1-2 (N.D. Ill. May 19, 2010).  Citing *Haywood*, the Court concluded that she was not exempt because she "represented her employer in its relationship with customers" and "[t]he essence of [her] job was keeping the clients happy."  *Id.* at *4.  On appeal, the Seventh Circuit affirmed, reasoning that the plaintiff was essentially an account manager: "[she was] not a . . . technician sitting at a phone bank fielding random calls from her employer's customers—instead she[] [was] on the customer's speed dial during the testing and operation of the customer's MediaBank software."  *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982 (7th Cir. 2011) (Posner, J.).

On the present record, GCSRs are less like the plaintiffs in *Haywood* and *Verkuilen* and more like call technicians, which have generally been deemed non-exempt.  *See, e.g.*, *Ribot v. Farmers Ins. Group*, 2013 WL 3778784 (C.D. Cal. July 17, 2013) (certifying class of customer service representatives in call centers for FLSA and state overtime claims); *Kritzer v. Safelite Solutions, LLC*, 2012 WL 1945144 (S.D. Ohio May 30, 2012) (certifying settlement class of customer service representatives for same); *see also Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 576-78 (6th Cir. 2004) (directing summary judgment in favor of help-desk IT employee on

administrative exemption); *Bruner v. Sprint/United Mgmt.*, 2007 WL 2436667, at *1 (D. Kan. Aug. 22, 2007) (recognizing call center customer specialists to be non-exempt). Consequently, the widespread existence of plausible administrative exemptions is too low to conclude that individualized issues will predominate over common ones.

### ii.   Damages

Bloomberg also argues that individualized inquiries will be necessary to determine damages because each employee will need to testify about what they were doing in order to determine whether such activity was compensable. This contention is not persuasive since Plaintiff has offered a single methodology for determining the bulk of damages—the badge data demonstrating when employees were physically in the office, as well as log-in data showing when employees logged into their computers, including from home. (Dkt. No. 18 ("Getman Decl.") ¶ 37.) Bloomberg relies upon this same data to challenge Plaintiff's credibility. Thus, there is an objective way to calculate a significant portion of damages without resort to individualized inquiry.

Although this data may not show, for instance, how long GCSRs studied for exams, it is well-settled that when an employer fails to keep complete records of hours, employees may prove their hours through representative testimony. *Anderson v. Mt. Clemens Pottery Co., Inc.*, 328 U.S. 680, 688 (1946). "[E]ven where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Id.* "A rule [instead] preventing employees from recovering for uncompensated work because they are able to determine precisely the amount due would result in rewarding employers for violating federal [and state] law." *Reich v.*

*Southern New England Telecomms. Corp.*, 121 F.3d 58, 69 (2d Cir. 1997) (citing *Mt. Clements*, 328 U.S. at 687).

Plaintiffs are therefore entitled an opportunity to "produce sufficient evidence to establish that [they] have in fact performed work for which they were improperly compensated and [to] produce[] sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'" *Id.* at 66-67 (quoting *Mt. Clements*, 328 U.S. at 687). "Upon meeting this evidentiary threshold, the fact of damage is established, and the only potential uncertainty is in the amount." *Id.* at 69 (citation omitted). Bloomberg, in turn, will have the opportunity to "produce evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence, [and] the court may then award damages to the employee[s], even though the result be only approximate." *Id.* at 67 (citation and quotations omitted). In *Reich*, the Second Circuit affirmed an overtime award on behalf of some 1500 craft workers based upon the representative testimony of 39 class members, or 2.5% of the class. *Id.* at 67-68. Given the overall uniformity of the class in this case, as well as its vastly smaller size, representative testimony is likely to be appropriate. Moreover, the percentage of damages based upon such testimony is likely to be minor in comparison to the damages based upon the badge and log-in data.

Bloomberg's reliance upon *Comcast Corp. v. Behrend* is unavailing. 133 S. Ct. 1426 (2013). This is not a case where Plaintiff has failed to offer a methodology for calculating damages that is tied to the class's theory of liability. Rather, Plaintiff's damages model—based upon badge data, log-in data, and representative testimony—will "measure only those damages attributable to th[e] theory" that GCSRs are entitled to overtime pay. *Id.* at 1433. To the extent that Bloomberg challenges Plaintiff's reliance upon representative testimony, its argument appears to be that *Comcast* overruled *Mt. Clemens sub silentio*. Numerous courts have rejected

such an expansive reading of *Comcast*, which "would virtually prohibit class certification in wage and hour cases where the employer had failed to keep the statutorily required time records enabling damages to be fixed mechanically." *Driver v. AppleIllinois, LLC*, 2013 WL 5818899, at *10-12 (N.D. Ill. Oct. 29, 2013); *see also Gomez v. Tyson Foods, Inc.*, 295 F.R.D. 397, 400-02 (D. Neb. 2013) (concluding that *Comcast* does not preclude wage and hour class actions relying upon the *Mt. Clemens* framework to establish damage); *Thompson v. Bruister and Assocs., Inc.*, 2013 WL 4507740, at *8-11 (M.D. Tenn. Aug. 23, 2013) (same); *Rosario v. Valentine Ave. Disc. Store, Co., Inc.*, 2013 WL 2395288, at *9 (E.D.N.Y. May 31, 2013) ("The question of whether class members were properly paid can be addressed by class-wide proof regarding the accuracy of defendants' payroll records, defendants' financial records, and testimony."), *rep. and rec. adopted*, 2013 WL 4647494 (E.D.N.Y. Aug. 29, 2013).  This Court likewise declines to read into *Comcast*—a Title VII discrimination case addressing a complete disconnect between a damages model and damages theory—a principle that would fundamentally undermine the use of the class action vehicle in the wage-and-hour context.  In the event that individual damages become an unmanageable issue, the Court can always decertify the class after determination of liability and provide notice to class members regarding how they can proceed to prove damages, or alternatively amend the class definition.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *overruled on other grounds*, *IPO*, 471 F.3d 24.

### b.    Superiority

A class action is a superior method to individually litigating the NYLL claims.  Although some GCSRs may be entitled to substantial overtime, those who worked relatively few overtime hours are unlikely to initiate individual actions.  Moreover, those GCSRs still employed by Bloomberg may decline to initiate individual actions due to fear of retaliation.  The Court is unaware of any pending litigation with which a class action might interfere or overlap, and

26

because the class is composed solely of individuals who worked in the New York metropolitan area, adjudication of the claims in this forum is desirable.  Finally, the difficulties involved in managing this kind of class action are minimal, particularly given the relatively small class size and the practice of courts in this District of permitting adjudication of state wage class claims alongside FLSA collective actions.  *See, e.g.*, *Flores*, 284 F.R.D. at 116-17; *Ansoumana*, 201 F.R.D. at 96.

### 3.    Class Counsel

Once a court has certified a class action, Rule 23(g) requires it to appoint class counsel. In determining whom to appoint, a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(A)(i)-(iv).  The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interest of the class."  *Id.* 23(g)(B). Plaintiff has asked the Court to appoint Getman Sweeney PLLC as class counsel.  As previously noted, counsel is experienced in handling cases such as this.  Moreover, counsel's caseload is manageable enough that the firm will be able to dedicate sufficient resources to this action. Counsel has also represented Plaintiff from the outset, performing all investigation and identifying all claims, and is representing a similar class in a wage and hour case against Bloomberg.  *See Enea v. Bloomberg, L.P.*, No. 12 Civ. 4656 (GBD) (FLSA and NYLL putative collective and class action on behalf of call center workers who handle customer service troubleshooting regarding the Bloomberg terminal).  The Court is satisfied that counsel will adequately represent the class, and appoints the firm as class counsel.

### C.     Notice

Plaintiff requests authorization to issue a proposed notice to potential class members by mail and e-mail; authorization to re-mail notices that are returned as undeliverable; an order requiring Bloomberg to post the notice in a conspicuous place where GCSRs are employed; and an order that putative class members be given 60 days from the date notice is sent to opt in. (Pl.'s Mem. Ex. A.)  In a footnote in its opposition memorandum, Bloomberg "reserves all rights to object to the form and content of" the proposed notice and consent to sue, "as well as the proposed method of delivery or communication."  (Dkt. No. 19 at 7 n.3.)  Bloomberg's opportunity to object, however, was in its opposition to Plaintiff's motion, and the Court therefore considers any objections it may have to be waived.  In any event, Plaintiff's proposed notice appears to be standard and appropriate.

The proposed notice appropriately includes the purpose of the notice, the nature of the lawsuit, the proposed class composition, the legal effect of joining the lawsuit, the fact that the court has not taken any position regarding the merits of the lawsuit, how to join the lawsuit, the purely voluntary nature of the decision and the legal effect of not joining the lawsuit, the prohibition against retaliation, and the relevant contact information for any inquiries.  *See ABA, The Fair Labor Standards Act*, 19-78-79 (Ellen C. Kearns et al. eds., 2d ed. 2010).  The notice does not, however, advise potential plaintiffs that they may be required to provide information, appear for a deposition, or testify if they opt in.  Because this information will aid potential plaintiffs in determining whether they would like to opt in, the Court directs Plaintiff to add a provision to the notice containing such information.  *Salomon*, 847 F. Supp. 2d at 566-67.  The notice is otherwise approved.  The proposed method of delivery, which is common in wage and hour actions, is also approved.

### D.      Identification Information

Plaintiff also requests an order requiring Bloomberg to provide, in electronically readable format, the names, addresses, e-mail addresses, telephone numbers, employee numbers or unique identifiers, and last four digits of social security numbers of all class members.  Bloomberg has not challenged this request, which is common in wage and hour actions to facilitate the notice process.  *See, e.g.*, *Lynch*, 491 F. Supp. 2d at 371-72.  Accordingly, Bloomberg is ordered to provide such information in electronically readable format within 10 days of this Court's order.

### E.      Equitable Tolling

Plaintiff finally requests that the Court toll the limitations period for the FLSA claims to account for the time required to decide the instant motion.  (Dkt. No. 28.)  Unlike Rule 23 class actions, in a FLSA collective action the limitations period continues to run for each plaintiff until he or she files written consent with the court to join the lawsuit.  29 U.S.C. § 256(b).  A district court may toll the limitations period to avoid inequitable circumstances, giving due consideration to whether the plaintiffs have acted with reasonable diligence in pursuing their claims and whether the circumstances are extraordinary enough to warrant equitable relief.  *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002).  The delay required to decide a motion may warrant equitable tolling.  *See, e.g.*, *Yahraes v. Rest. Assocs. Events Corp.*, 2011 WL 844963, at *1 (E.D.N.Y. Mar. 8, 2011) (citing cases).  "While plaintiffs wishing to pursue their rights cannot sit on them indefinitely, those whose putative class representatives and their counsel are diligently and timely pursuing the claims should also not be penalized due to the courts' heavy dockets and understandable delay in rulings."  *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012).

Plaintiff moved for conditional certification shortly after filing the complaint, and the motion has been fully briefed for more than seven months.  Absent tolling of the limitations

period, a substantial number of class members may now be time-barred through no fault of counsel or the class representative.  Bloomberg argues that tolling is inappropriate for two reasons.  First, it claims that "all potential FLSA opt-in plaintiffs" were made aware of the instant lawsuit through the settlement check cover letters sent in connection with the DOL Settlement.  (Dkt. No. 29.)  But while the letters expressly mention this lawsuit, the settlement covers FLSA claims only for the period from July 1, 2009 through June 30, 2011, and Bloomberg did not reclassify GCSRs as exempt until April 28, 2013.  (DOL Settlement.)  There is no reason to assume that GCSRs who worked exclusively between July 1, 2011 and April 28, 2013 received the settlement letter accompanying the settlement check, since they were not entitled to compensation under the settlement.  Nor has Bloomberg indicated that the settlement period was subsequently extended beyond June 30, 2011, such that the remaining GCSRs received notice of this lawsuit.

Second, Bloomberg relies upon *Mendoza v. Ashiya Sushi 5, Inc.* to argue that equitable tolling is inappropriate because the delay in deciding the motion was not caused by "events external to consideration of the motion itself," such as a party's litigation strategy, and in any event the Court can make tolling determinations later on a case-by-case basis.  No. 12 Civ. 8629 (KPF), 2013 WL 5211839, at *10 (S.D.N.Y. Sept. 16, 2013).  In *Mendoza*, Judge Failla recognized that equitable tolling for delay in deciding a motion is "[o]ften" granted only when external circumstances cause the delay, but declined to reach the issue because it was not clear whether any potential opt-in plaintiffs would be barred due to a delay in notice.  *Id.* at *10 (citations omitted).  Accordingly, she postponed consideration of the tolling issue until after the opt-in period, at which point any time-barred plaintiffs could seek equitable tolling on an individual basis.  *Id.* at *10.  Notably, the motion in *Mendoza* was decided in a period of less than three months.  *Id.* at *2.  It was therefore reasonable to assume that few, if any, potential

opt-in plaintiffs would be time barred as a result.  In contrast, Plaintiff's motion has been

pending for over twice as long, raising a greater risk that a sizeable number of potential plaintiffs

will have become time-barred.  Under these circumstances, the Court declines to adopt a

piecemeal approach to equitable tolling, which would waste judicial resources, further delay

resolution of this action, and contravene the purposes of FLSA.  "Accordingly, the statute of

limitations will be tolled as of the date of the filing of [Plaintiff's] motion." *McGlone*, 867 F.

Supp. 2d at 445.

**IV.    Conclusion**

    For the foregoing reasons, it is hereby ORDERED that:

    Plaintiff's motion is GRANTED;

    Plaintiff's counsel is appointed as class counsel;

    Plaintiff's counsel is authorized to issue notice in the manner described in this Order;

    Bloomberg is ordered to provide Plaintiff's counsel with identification information in the

form and manner described in this Order; and

    The statute of limitations for Plaintiffs' FLSA claims is tolled as of the date of the filing

of the instant motion.

    The Clerk of Court is directed to terminate the motion at docket number 13.

    SO ORDERED.

Dated: New York, New York
      March 19, 2014

                                   J. PAUL OETKEN
                       United States District Judge